(786 P.2d 630)
No. 63,548

STATE OF KANSAS, *Appellee*, v. MICHAEL ROBERTS, *Appellant*.

Opinion filed January 26, 1990.

*Rick Kittel*, assistant appellate defender, and *Jessica R. Kunen*, chief appellate defender, for the appellant.

*Kenneth R. Smith*, assistant county attorney, and *Robert T. Stephan*, attorney general, for the appellee.

Before ABBOTT, C.J., REES and BRISCOE, JJ.

REES, J.: This is a direct appeal by defendant Michael Roberts from his jury convictions for sale of heroin (K.S.A. 65-4127a; K.S.A. 65-4101[p][1]) and sale of cocaine (K.S.A. 65-4127a; K.S.A. 65-4101[p][4]).

The primary question raised for our resolution is whether the trial court erred in refusing to exclude the testimony of John Wimbish, the State's principal witness.

Wimbish was an investigator assigned to the U.S. Army Criminal Investigation Division (CID) unit stationed at Fort Riley. Acting as an undercover agent, Wimbish made off-installation buys of narcotic drugs from defendant Michael Roberts, a civilian, on December 11, 1986, and December 12, 1986. The first buy was of heroin; the second was of cocaine. The two buys gave rise

to the initiation of this prosecution by the filing of a two-count complaint/information on May 29, 1987. Roberts was arrested on March 14, 1988. He was tried on November 18, 1988.

In the record, Wimbish is identified as a semi-covert "drug suppression team" (DST) member. Whether all DST members were CID personnel or whether the DST also included Junction City Police Department (JCPD) personnel is not clear. However, the record does disclose that Wimbish's two buys took place under back-up visual surveillance conducted by CID personnel and a JCPD officer. After completing each buy, Wimbish orally reported what had transpired to the JCPD officer at the Junction City police station. Wimbish then field tested the purchased substances at his office on Fort Riley, found they tested positive, and, on December 12 and 16, gave the purchased substances and the field test results to the JCPD officer.

Neither Wimbish nor other CID personnel directly or indirectly participated in the making of an arrest, or in the conduct of a stop and frisk, or in the execution of a search or seizure. Neither Wimbish nor other CID personnel had any direct or indirect contact or involvement with Roberts other than the making of the buys and the conduct of the surveillance.

Wimbish's superior's CID investigation report states: "This investigation was conducted as a joint investigation with . . . JCPD. Coordination was made on a routine basis with [JCPD]." According to that same report, the CID activity was triggered by a December 11 report to the CID by one of its confidential informants that "he had purchased drugs from Michael Roberts in the past." Somewhat in contrast, when the JCPD officer was asked at trial whether he asked the CID "to assist you in making these drug buys," he answered, "Yes." This is the sole record evidence concerning the subjects of who asked whom for assistance and the relationship of the CID and JCPD personnel when acting in this matter.

Roberts complains that the exclusionary rule, applied to unlawful search and seizure evidence to assure an individual's personal Fourth Amendment rights, should have been invoked here so as to exclude Wimbish's testimony.

The foundation of Roberts' argument is the federal Posse Comitatus Act (PCA) (18 U.S.C. § 1385 [1982]). It reads:

"*Whoever*, except in cases and under circumstances expressly authorized by the Constitution or Act of Congress, *willfully uses any part of the Army . . .* as a posse comitatus or otherwise *to execute the laws* shall be fined not more than $10,000 or imprisoned not more than two years, or both." (Emphasis added.)

By its language, the PCA is a penal statute; it effectively proscribes certain conduct; it fixes a penalty for its violation. The trial court ruled that the PCA was not violated in the present case.

Not mentioned by the parties is 10 U.S.C. § 375 (1982), a corollary to the PCA (*State v. Short*, 113 Wash. 2d 35, 775 P.2d 458 [1989]), which, as in effect on December 11 and 12, 1986, provided:

"The Secretary of Defense shall issue such regulations as may be necessary to insure that the provision of any assistance (including the provision of any equipment or facility or the assignment of any personnel) to any civilian law enforcement official under this chapter [10 U.S.C. § 371 *et seq.* (1982)] does not include or permit direct participation by a member of the Army . . . in . . . a search and seizure, arrest, or other similar activity unless participation in such activity by such member is otherwise authorized by law."

It seems that the Secretary of Defense complied with the direction of 10 U.S.C. § 375 by the issuance of the regulations found at 32 C.F.R. § 213.1 *et seq.* (1988). Presently pertinent are these provisions of those regulations:

"§ 213.1 Purpose. This part [32 C.F.R., ch. 1, part 213] establishes uniform DOD [Department of Defense] policies and procedures to be followed with respect to support provided to Federal, State, and local civilian law enforcement efforts."

"§ 213.4 Policy. It is the policy of the Department of Defense to cooperate with civilian law enforcement officials to the maximum extent practicable. Under §§ 213.8 through 213.11, the implementation of this policy is consistent with the needs of national security and military preparedness, the historic tradition of limiting direct military involvement in civilian law enforcement activities, and the requirements of applicable law."

"§ 213.10 Restrictions on participation of DOD personnel in civilian law enforcement activities. (a) *Statutory requirements.* (1) The primary restriction on military participation in civilian law enforcement activities is the Posse Comitatus Act (18 U.S.C. 1385) . . . .

. . . .

"(3) *Restrictions on direct assistance.* Except as otherwise provided in this enclosure, the prohibition on use of military personnel 'as a posse comitatus

or otherwise to execute the laws' prohibits the following forms of direct assistance:

. . . .

"(ii) A search or seizure.

"(iii) An arrest, stop and frisk, or similar activity.

"(iv) Use of military personnel for surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators.

. . . .

"(7) *Other permissible assistance.* The following forms of indirect assistance activities are not restricted by the Posse Comitatus Act . . .:

. . . .

"(ii) . . . [A]ctions, approved in accordance with procedures established by the head of the DOD Component concerned, that do not subject civilians to the exercise of military power that is regulatory, proscriptive, or compulsory in nature."

We are satisfied that the activity of military personnel addressed by the PCA and the DOD regulations is the subjection of civilians to the unauthorized assertion of military power or authority that is regulatory, proscriptive, or compulsory in nature. See 32 C.F.R. § 213.10(a)(7); *State v. Short,* 113 Wash. 2d 35. A power regulatory in nature is one which controls or directs. A power proscriptive in nature is one that prohibits or condemns. A power compulsory in nature is one that exerts some coercive force. *United States v. Yunis,* 681 F. Supp. 891, 895-96 (D.D.C. 1988). (Although our resolution of this appeal is on another ground, we comment that, in our opinion, there was no violation of the PCA for the reason that none of the activities of Wimbish and the other CID personnel constituted the exercise of regulatory, proscriptive, or compulsory military power.) The DOD regulations in effect in December 1986 used specific language in directing that, *unless authorized,* direct assistance to civilian law enforcement agencies and officials in the form of use of military personnel for (1) search or seizure; (2) an arrest, stop and frisk, or similar activity; or (3) surveillance or pursuit of individuals, or as informants, undercover agents, investigators, or interrogators, was not to be undertaken. 32 C.F.R. § 213.10(a)(3). Also, see 10 U.S.C. § 375.

The DOD regulations are in the nature of policy statements. 32 C.F.R. § 213.1. They fix no penalty for violation. They enunciate self-imposed restrictions upon the activities of DOD per-

sonnel. They do not spawn a personal right as does the Fourth Amendment.

Missing from the record made in this case and the appellate briefs is any exposition of the existence or nonexistence of authority for the "joint investigation" and "coordination on a routine basis" referred to in the written CID report. Neither is there any exposition of the existence or nonexistence of "circumstances expressly authorized by . . . Act of Congress" (18 U.S.C. § 1385), or approval of actions in accordance with procedures established by the head of a concerned DOD component.

We are aware of only one Kansas case that concerns the PCA. It is *State v. Danko*, 219 Kan. 490, 548 P.2d 819 (1976). There, the Supreme Court reversed a trial court suppression order. As a practical matter, *Danko* is *the* case authority upon which Roberts now relies.

We need not describe at length the factual dissimilarity of *Danko* and the case before us. It is sufficient to observe that, in *Danko*, a Fort Riley military police sergeant, while on "joint patrol" with JCPD officers "under an arrangement between military authorities and Junction City police officials," conducted a warrantless search of a part of the interior of a stopped vehicle. The vehicle, a suspected armed robbery "get away" vehicle, was occupied by two men who it seems were civilians. The MP's search was conducted at the request of one of the JCPD officers, John Hill. The MP seized a pistol he found under the passenger seat. It was later identified as the robbery weapon.

In the *Danko* appeal, the State maintained that the conduct of Hill and the MP did not constitute a violation of the PCA and that the trial court erred in excluding the evidence. After holding that the State's contention that there was no violation of the PCA could not be upheld, the Supreme Court said:

"[I]n our consideration of the State's appeal, we shall treat the conduct of Hill and [the MP] as constituting a technical violation of the [PCA] although neither has been charged nor convicted. This does not, however, dispose of the question presented on appeal. We cannot agree with defendants that a technical violation of the [PCA] under the circumstances shown to exist warrants the suppression ,of the evidence seized . . . ." 219 Kan. at 493. "*United States v. Walden* (4th Cir. 1974), 490 F.2d 372, cert. den. 416 U.S. 983, 40 L. Ed. 2d 760, 94 S. Ct. 2385, reh. den. 417 U.S. 977, 41 L. Ed. 2d 1148, 94 S. Ct. 3187, is one of the few reported cases dealing directly

with the exclusion of evidence in a posse comitatus situation and we find the rationale therein persuasive." 219 Kan. at 495.

"The [*Walden*] court reasoned that the Navy regulation . . . should be given the same legal effect as the Posse Comitatus Act." 219 Kan. at 496.

"We agree with the view of the *Walden* court that the [PCA] expresses a policy that is for the benefit of the people as a whole, rather than a policy which could be characterized as designed to protect the personal rights of individual citizens as declared in the Fourth Amendment. The absence of cases involving a posse comitatus situation, such as at bar, considered in the light of the longtime presence of military establishments in this state, leads us to the position adopted by the *Walden* court that application of the *extraordinary* remedy of exclusion is unnecessary as an *added* deterrent to the serious criminal sanctions provided in the [PCA]." 219 Kan. at 497-98. (Emphasis added.)

"The *Walden* court . . . declined to impose the extraordinary remedy of an exclusionary rule. The court warned, however, that,

'. . . Should there be evidence of widespread or repeated violations in any future case, or ineffectiveness of enforcement by the military, we will consider ourselves free to consider whether adoption of an exclusionary rule is required as a future deterrent.' (p. 377.)" 219 Kan. at 496.

To our knowledge, the present case is only the second case to come before any court of this state involving actual or possible violation of the PCA or related regulations issued by the DOD or a branch of our Armed Forces. It involves activity of military personnel that took place more than ten years after *Danko* was filed. Nonetheless, Roberts argues that, because of *Danko's* approval of the *Walden* reservation of the freedom to give future consideration to possible imposition of the exclusionary rule in cases of violation of the PCA or related regulations, that extraordinary remedy should be imposed in this case. We disagree.

We are not persuaded that, even if a PCA violation had occurred in this case, this single instance evidences widespread and repeated PCA violations or ineffectiveness of military enforcement of the PCA of a magnitude that requires as a matter of law that we find that the trial court erroneously failed to exclude Wimbish's testimony. Further, inasmuch as the PCA incorporates the enforcement tool of fine, imprisonment, or both, we cannot accept the proposition that the additional extraordinary remedy of exclusion is now called for.

In our examination of case decisions from other jurisdictions involving the question of exclusion of evidence because of PCA

violation, *Taylor v. State*, 645 P.2d 522, 525 (Okla. Crim. 1982), is the only case found where exclusion was approved. That, in our view, does not constitute a compelling body of authority. Cases disclosing rejection or disapproval of imposition of the exclusionary rule include: *United States v. Hartley*, 796 F.2d 112, 115 (5th Cir. 1986), and *State v. Short*, 113 Wash. 2d at 40 (both finding no violation of PCA and also that in any event exclusion is inappropriate); *United States v. Roberts*, 779 F.2d 565 (9th Cir. 1986) (finding no violation of PCA but a violation of 10 U.S.C. §§ 371 *et seq.*, and holding exclusionary rule inapplicable by analogy to PCA).

In *Hartley*, it is said that, "where a violation of the [PCA] is found or suspected, courts have generally found that creation or application of an exclusionary rule is not warranted." 796 F.2d at 115. And, in *People v. Hayes*, 144 Ill. App. 3d 696, 700, 494 N.E.2d 1238 (1986), it is said, "with few exceptions, the courts have uniformly held that the exclusionary rule does not apply to evidence seized in violation of the [PCA]."

In *Roberts*, it is said that "courts have uniformly refused to apply the exclusionary rule to evidence seized in violation of the [PCA]." 779 F.2d at 568. In the same opinion, it is said that *United States v. Walden*, 490 F.2d 372, 377, (4th Cir.), *cert. denied* 416 U.S. 983 (1974), is in accord with *United States v. Wolffs*, 594 F.2d 77, 85 (5th Cir. 1979), where it was "held that the extraordinary remedy of exclusion was inappropriate until such time as 'widespread and repeated violations' of the [PCA] demonstrated the need for such a remedy." 779 F.2d at 568.

Particularly applicable here, as we see it, is this *Walden* language as adapted to the case before us:

"In the appeals at bar, the evidence of defendant's guilt is overwhelming. While the bulk of the evidence was obtained by violating the [regulations], there is totally lacking any evidence that there was a conscious, deliberate or willful intent on the part of [Wimbish or the JCPD officer] to violate the [regulations] or the spirit of the [PCA]. From all that appears, [Wimbish and the JCPD officer] acted innocently albeit ill-advisedly. The [regulations provide] no mechanism for [their] enforcement and the Act, where it is applicable, renders the transgressor liable to criminal penalties but does *not* provide that '[t]he criminal is to go free because the constable has blundered.' *People v. Defore*, 242 N.Y. 13, 21, 150 N.E. 585, 587 (1926) (Cardozo, J.)." 490 F.2d at 376.

As his other issue, Roberts points us to *State v. Warren*, 230 Kan. 385, 635 P.2d 1236 (1981), and complains that the trial court erred in failing to give a cautionary eyewitness identification instruction. We will not address this complaint because the record on appeal does not establish that the issue was raised in the trial court and preserved for appellate review. An issue not raised before or presented to the trial court cannot be raised for the first time on appeal. *Kansas Dept. of Revenue v. Coca Cola Co.*, 240 Kan. 548, 552, 731 P.2d 273 (1987); *Eisenhut v. Steadman*, 13 Kan. App. 2d 220, 223, 767 P.2d 293 (1989).

The record on appeal does not include the trial court's instructions (filed November 18, 1988), any written requested instructions, or any record of objections to instructions given or to failure to give requested instructions. A party must designate an adequate record on appeal to substantiate contentions made to the appellate court. Without such a record, claims of alleged error must fail. *Eisenhut*, 13 Kan. App. 2d at 223.

Further, subject to certain exceptions, one of which is clear error, entitlement to appellate review of trial court failure to give a requested instruction, whether the case be criminal or civil, necessitates the showing that the requested instruction was submitted in writing, that there was objection to the failure to give the instruction, and that the objection distinctly stated the ground or grounds for the objection. In addition to the plain statutory language of K.S.A. 22-3414(3) and K.S.A. 60-251, see, for example, *State v. Wilson*, 221 Kan. 92, 96, 558 P.2d 141 (1976); *State v. Boone*, 220 Kan. 758, 770, 556 P.2d 864 (1976); *State v. Nesmith*, 220 Kan. 146, 150, 551 P.2d 896 (1976); and *State v. Johnson*, 219 Kan. 847, 851, 549 P.2d 1370 (1976).

Roberts seeks to "cure" the record deficiency by arguing that the trial court's failure to give a *Warren* instruction as found at PIK Crim. 2d 52.20 constituted clear error. We are not persuaded.

The failure to give an instruction is clearly erroneous only if the reviewing court reaches a firm conviction that, if the trial error had not occurred, there was a real possibility the jury would have returned a different verdict. *State v. DeMoss*, 244 Kan. 387,

391-92, 770 P.2d 441 (1989). Under the facts of this case, we do not have that firm conviction.

Affirmed.